UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:11-CV-633-H

STEPHEN LEWIS, JR.                                                              PLAINTIFF

v.

NORFOLK SOUTHERN RAILWAY COMPANY,
JAMES E. ROSKOVICS, and
SHIRRELL JONES, JR.,                                                            DEFENDANTS

**MEMORANDUM ORDER AND OPINION**

This employment discrimination case is before the court on the Defendants' motions for summary judgment.[1] Plaintiff, an African-American man, alleges that Defendants discriminated against him on the basis of his race and asserts a claim for failure to promote and disparate treatment under the Kentucky Civil Rights Act, KRS § 344.010 *et seq.*, and for breach of contract in violation of 42 U.S.C. § 1981.

Specifically, Mr. Lewis contends that Roskovics and Norfolk Southern Railway Company ("NSRC") discriminated against him in 2009 when they removed a posted job opening only to repost it three months later with an additional, superfluous requirement that excluded Lewis. Further, Lewis alleges that in 2011 Jones and NSRC treated him differently than a similarly situated person outside of his protected class when they charged him with "conduct unbecoming an employee" after a drug-related guilty plea.

---

[1] Each of the two individual defendants has filed a separate motion for summary judgment on liability, and NSRC has joined both. Roskovics and NSRC's motion for summary judgment is found in the record at DN 46. Jones and NSRC's motion for summary judgment is found at DN 47. All parties join in a third motion for summary judgment on the issue of punitive damages at DN 48.

Much of the extensive discovery essentially concerns NSRC's business judgment in determining the number of employees needed as its business varied and the necessary qualifications for those employees. These are matters of business judgment from which it is particularly difficult to infer discriminatory purposes. Regardless of this general overview, the Court will conduct its usual step-by-step analysis.

I.

This action is based on two separate series of occurrences: two car shop job postings in 2009 and Lewis's "conduct unbecoming" charge in 2011. The former implicates Defendant Roskovics and NSRC, while the latter involves only Jones and NSRC. The material facts are as follows.

A.

Beginning in June 2004, Plaintiff worked as an apprentice car man in the Mechanical Department of Norfolk Southern Railway Company's Youngstown Yard located in Louisville, Kentucky. As an apprentice, Lewis garnered experience both outside as a "yard man" and inside as a "shop man," performing all functions and duties related to the inspection, repair, and service of railway equipment for NRSC.

In February 2007, Lewis completed his training and received a promotion to a full-fledged car man. This allowed him to bid on "inside" jobs.[2] Lewis worked outside inspecting and repairing rail cars in the yard. Roskovics was the acting Senior General Foreman of the Mechanical Department in Louisville. Roskovics's supervisor was Division Manager of Mechanical Operations Kevin Krull, who was located in Knoxville, Tennessee. Roskovics's

---

[2] As a journeyman car man, the terms and conditions of Lewis's employment were governed, subject to the strictures of state and federal law, by the Collective Bargaining Agreement ("CBA") between NSRC and the employees represented by the Brotherhood Railway Carmen Division – Transportation Communications and International Union ("BRC").

responsibilities included supervising the operations and all employees of the Mechanical Department in Louisville. During Roskovics's tenure, there were around sixty employees in Louisville's Mechanical Department, four of whom were African-American.

In the spring of 2009, a general downturn in the economy and a contemporaneous decrease in the volume of freight, coal, and other commodities moving by rail through certain areas caused NSRC supervisory personnel to furlough seven employees in the Louisville Mechanical Department. During the same period, five Mechanical Department employees took FMLA leave. In all, the Mechanical Department's workforce was down 22%.

At some point during this period, the rail car shop apparently experienced an increase in "bad ordered" rail cars and Roskovics determined that he needed more employees inside the shop to handle the work without incurring substantial overtime expenses. To address the situation, Roskovics issued six bulletins: three eliminating existing yard positions and three creating shop positions. One of these three new shop positions, Bulletin Local No. 2009-28, is at issue here. Bulletin 2009-28 reads in pertinent part:

> DATE: June 1, 2009
> CRAFT: Carman-Shop C4649
> LOCATION: Louisville, KY
> Youngstown Yard
> ASSIGNED HOURS: 3:00p.m. – 11:00p.m.
> Rest Days: Saturday – Sunday
> JOB RESPONSIBILITIES: Repair, inspect and service railway equipment.
> RATE OF PAY: per current shop craft agreement.
> VACATED BY: New Position
>
> Qualified employees desiring this position must file their bids with the issuing officer before 7:00 a.m., June 5, 2009, with a copy to your Local Chairman. Applications of employees failing to follow this procedure will not be considered.
>
> J.E. Roskovics
> Senior General Foreman

cc: Paul Jackson

During Roskovics's tenure, bulletins announcing available jobs were placed in a binder in the car man's lounge. Per the governing CBA, job vacancies were to remain posted for a period of five days. The procedure for bidding on a job in Louisville entailed placing one's bid in a locked box located in the Senior General Foreman's ("SGF") office and providing a copy to the union steward. Only the supervisors and the office clerk possessed the combination to the locked box. At the expiration of the bidding period, the locked box would be opened and the job awarded to the car man with the most seniority who met the eligibility requirements, in accordance with the provisions of the applicable CBA.

According to Defendants, due to changing business needs, on June 3 Roskovics and Krull decided to cancel all the bulletins Roskovics had posted on June 1. Lewis says that he bid for the shop job listed in Bulletin 2009-28 before it was canceled and that at least one other employee, Chris Hiser, a white male, told Lewis that he had bid also. Chris Hiser was still an apprentice in June and less senior to Mr. Lewis.

Lewis claims he was in the break room on June 4, 2009 and overheard Hiser, standing in an adjacent room, having a telephone conversation with Roskovics. After this conversation ended, Hiser addressed Lewis and allegedly said "I screwed you out of a job." Hiser then confirmed that he had been talking with Roskovics and that the six bulletins posted on June 1, including the shop job Lewis claims both he and Hiser had already bid on, were being canceled. According to Lewis, Hiser asked Roskovics to place apprentices on the job and/or to pull the job. Roskovics denies ever talking to Hiser about the June postings and cancelations.

In any event, the realignment of the six jobs did not go forward. Lewis continued in his "outside" job. On September 14, 2009, Roskovics posted a different vacancy announcement, Bulletin 2009-33. Bulletin 2009-33 reads in pertinent part:

    DATE:                       September 14, 2009
    CRAFT:                     Carman-Shop
    LOCATION:             Louisville, KY
                                  Youngstown Yard
    ASSIGNED HOURS:    3:00p.m. – 11:00p.m.
                                  Rest Days: Saturday – Sunday
    JOB RESPONSIBILITIES:    Repair, inspect and service railway
                                  equipment. CDL required.
    RATE OF PAY:           per current shop craft agreement.
    VACATED BY:            New Position

    Qualified employees desiring this position must file their bids with the issuing officer before 7:00 a.m., Saturday, September 19, 2009, with a copy to your Local Chairman. Applications of employees failing to follow this procedure will not be considered.

    J.E. Roskovics
    Senior General Foreman

    cc: C. Hiser

Lewis did not apply for this job because he did not possess the required Commercial Driver's License ("CDL").

A cursory comparison of the two bulletins reveals that the shop job advertised in Bulletin 2009-33 involved the same essential job functions as the shop job posted (then canceled) in June in Bulletin 2009-28. The only difference in September was the added requirement that bidders possess a CDL. Chris Hiser had a CDL and was awarded the position at the close of the bidding process. Lewis contends that the CDL requirement is a sham requirement Roskovics added because he knew that neither Lewis nor any of the other three African-Americans working at Youngstown Yard could meet the requirement.

B.

Lewis continued working in a yard position on second shift at Youngstown Yard, with Friday and Saturday as his rest days. After leaving work on Thursday, October 8, 2009, Lewis was arrested in his home and charged with trafficking in a schedule IV controlled substance and maintaining a common nuisance. Reasoning that his charges were not company-related, Lewis did not inform anyone at NRSC about them.

One day later, Stephen Crush, special supervisory agent with Norfolk Southern's police department, called Youngstown Yard's General Foreman Steven Todd and informed him of Lewis's arrest. That same day, Todd obtained a copy of Lewis's arrest record. Shirrell Jones, the new SGF effective October 1, 2009, had not arrived in Louisville yet, so Todd called DMMO Kevin Krull with the information. Krull requested a copy and Todd emailed a scan of the arrest record the same day.

Lewis had already taken vacation days on Sunday and Monday. When he returned to work on October 13, NSRC had arranged for Lewis to take a drug test. He was taken out of service pending the results. Realizing he would test positive because he had smoked marijuana the previous weekend, Lewis voluntarily entered into NSRC's Drug and Alcohol Rehabilitation (DARS) program instead of facing disciplinary action.

After Lewis's return, he continued to perform his job satisfactorily and almost a year passed without event. Lewis agreed to random drug testing as a condition of his return to work in 2010 and did not test positive for any substance from the time of his return until the time he was terminated in September 2011.

In June 2011, Jones offered Lewis the opportunity to train for a welding inspector certificate in Roanoke, Virginia. On June 23, 2011, unbeknownst to his employer, Lewis pled guilty to possession of a schedule IV controlled substance in Floyd Superior Court in Indiana.

Lewis attended the week-long welding inspector training in July 2011. A few days later, as Lewis was heading home, Jones discovered Lewis's guilty plea during a routine background check. Jones notified DMMO Krull about the nature of the plea and the decision to remove Lewis from service and charge him with conduct unbecoming an employee for violating NSRC's drug policy. That policy defines "drug" as a "prohibited or controlled substance[] as defined by law." Regarding off-the-job drug activity, the policy provides:

> Employees who are convicted in connection with incidents involving off-the-job drug activity will be considered in violation of this policy and subject to dismissal.

Jones advised Lewis of the internal charge and the decision to remove him from service.

The CBA governing Lewis's employment entitled Lewis to a formal hearing process on his disciplinary charge. He was given appropriate notice of a formal investigation and of a hearing. The hearing was conducted by DMMO Diane Barnett, an African American. Lewis attended and was given the opportunity to cross-examine NSRC's witnesses and to present any evidence to rebut the charges that he violated the Off-the-Job Drug Activity Policy. At the conclusion of the hearing, Barnett found that Lewis had violated the policy by pleading guilty to the charge of Possession of a Schedule IV Controlled Substance. Through Barnett, NSRC sent a letter of termination to Lewis on September 6, 2011.

Following his termination, Lewis exercised his right under the Railway Labor Act to challenge his dismissal before a Public Law Board of arbitration. The Board found that NSRC's

dismissal as a car man "was fully warranted in light of the recognized seriousness of the offense which was related to [Plaintiff's] illegal drug activity."

II.

In his amended complaint Lewis named his former supervisors SGF Roskovics and SGF Jones in their individual capacities alongside NSRC. He makes a failure to promote claim (Count I) against Roskovics and NSRC under the Kentucky Civil Rights Act (KRS Chapter 344) and a race discrimination claim against Defendants Jones and NSRC under the same (Count II). He also makes a claim against all defendants under the Civil Rights Act of 1866 (42 U.S.C. Section 1981) (Count III). Defendants filed two separate motions for summary judgment on all claims of liability on August 27, 2013.

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The Supreme Court elaborated that the standard for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). According to this standard, the moving party bears the initial burden of "informing the district court of the basis of its motion" and "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The facts, and the inferences drawn from them, must be viewed in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. The moving party may meet its burden by showing an absence of evidence to support an essential element of the nonmoving party's case for which the nonmoving party has the burden of proof. *Id.*

Upon meeting this burden, the nonmoving party may only overcome summary judgment by showing that a genuine dispute exists, using specific facts that "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electrical Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

III.

Before considering the substantive issues at hand, the Court finds the need to at least discuss several procedural matters.

First, Roskovics and NSRC argue that Lewis's claims relating to the June cancelation and the addition of a CDL requirement to next posted shop job are "minor disputes" that Lewis should have grieved under the Railway Labor Act ("RLA") (45 U.S.C. § 151 *et seq.*). Though Lewis could have challenged at least one of those decisions under the RLA,[3] his contention with those decisions here is not a "minor dispute" and his right to recovery does not hinge on the CBA or deciding whether Defendants' decisions were appropriate thereunder. Lewis's challenge here reaches the motivation behind those decisions. The Kentucky Civil Rights Act protects Lewis from employment decisions that are infected with racial animus and 42 U.S.C. § 1981 protects Lewis from breaches of contract based on racial discrimination. In other words, Lewis's challenge is a "collateral dispute" governed by independent state and federal laws and is not a "minor dispute" impacted by the RLA. *Accord Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 260 (1994) ("[A] state-law cause of action is not pre-empted by the RLA if it involves rights and obligations that exist independent of the [collective bargaining agreement].").

---

[3] Rule 17 of the CBA that governed Lewis's employment specifies that postings announcing new positions or vacancies "shall be bulletined . . . for a period of five (5) days." DN 47-14. It is undisputed that the bulletins posted on June 1, 2009 were canceled before the prescribed time had passed. This cancelation decision, theoretically, could have been grieved. In contrast, the excerpted portions of the CBA available on the record do not appear to place parameters around the addition of a CDL requirement to posted job openings. Regardless, it is the motivation behind these employer actions and not the discrete actions themselves that Lewis contests here.

Jones and NSRC likewise argue the RLA preempts and/or bars Lewis's claims against them. Lewis's claims against Jones and NSRC, unlike his claims against Roskovics and NSRC, *do* require the court to interpret portions of the CBA. Determining whether Lewis meets the fourth prong of a prima facie case of discrimination—i.e., whether he was treated differently than a similarly situated non-protected employee—could require the Court to consider whether his alleged comparator could possibly have been charged under the CBA. Some Sixth Circuit law suggests that when a court must interpret portions of a CBA to decide a claim, regardless of whether the court's ruling will ultimately turn on the motive behind the employer's differential treatment, the claim is to be deemed a "minor dispute" and held preempted and/or barred by the RLA. *See, e.g.*, *Dotson v. Norfolk Southern R.R. Co.*, 52 F. App'x 655, 658 (6th Cir. 2002) (affirming dismissal of a disparate treatment claim on RLA preemption grounds and adopting the reasoning that "[w]hether or not Plaintiff was disciplined more harshly . . .or . . . should have been disciplined at all, depends upon an interpretation of the CBA regulations regarding discipline. . . . In other words, in order to dispose of Plaintiff's claims, the Court [would] need to look at more than just Defendants' motives.").

Despite the language in *Dotson*, the Court will proceed to analyze the substance of Lewis's claims against Jones and NSRC. This course seems reasonable in light of the precedent in *Norris* and the open question of whether a claim that happens to bear some attributes of a "minor dispute" (i.e., incidentally requires interpretation of a CBA) but nevertheless arises under independent federal and/or state law might still be treated as a "collateral dispute," redressable in court without first having to exhaust the RLA's remedies.[4]

---

[4] Case law in other factual contexts suggests the answer to this question is yes. *See Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 565, 567 (1987) ("It is inconceivable that Congress intended that a worker who suffered a disabling injury would be denied recovery under the [Federal Employee Liability Act (FELA)] *simply because he might also be able to process a narrow labor grievance* under the RLA to a successful conclusion. …As far as a

IV.

Plaintiff has described his claim against Roskovics and NSRC as a "failure to promote" claim. The facts do not fit this technical specification. The Court will analyze Lewis's claim in Count I, like Count II, as a general race discrimination claim.[5]

Race discrimination claims under the KCRA are interpreted the same way as those under Title VII of the Civil Rights Act of 1964. *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000). Absent direct evidence of discrimination, the Sixth Circuit and Kentucky have adopted the *McDonnell Douglas* burden shifting scheme. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (2008); *Williams v. Wal-Mart Stores, Inc.*, 184 S.W.3d 492, 495 (Ky. 2005). Under this framework, if the plaintiff can establish a prima facie case, the burden shifts to the defendant to provide legitimate, nondiscriminatory reasons for the adverse employment action. If the defendant succeeds, the burden shifts back to the plaintiff to show that the defendant's asserted nondiscriminatory reasons were mere pretext for discrimination. The Court will proceed under this analytical framework.

A.

To make a prima face case for racial discrimination in the employment context a plaintiff has to prove that: "(1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the

---

worker's right to damages under the FELA is concerned, Congress' enactment of the RLA has had no effect.") (emphasis added), cited with approval in *Int'l Bhd. of Teamsters, AFL-CIO v. UPS Co.*, 447 F.3d 491 (6th Cir. 2006).

[5] Though not raised in summary judgment briefing, the Court notes that the KCRA does not allow for individual liability against Roskovics and Jones. *Wathen v. General Elec. Co.*, 115 F.3d 400, 401, 405 (6th Cir. 1997) (holding that individual employees cannot be held liable under Title VII or the Kentucky Civil Rights Act); *Smith v. Leggett Wire Co.*, 220 F.3d 752, 758 (6th Cir. 2000) (reiterating that race discrimination claims brought under the Kentucky Civil Rights Act are evaluated using the same standards as Title VII claims). This fact does not affect the following discussion; as agents of the company, Roskovics's and Jones's actions provide the basis for NSRC's potential liability. Further, the events underlying Lewis's KCRA claims form the basis of his breach of contract claims, and 42 U.S.C. § 1981 does allow for individual liability. *Jones v. Continental Corp.*, 789 F.2d 1225, 1231 (6th Cir. 1986).

protected class or treated differently than similarly situated non-protected employees." *White*, 533 F.3d at 391 (internal citations omitted). NSRC and Roskovics concede that Lewis, as an African-American, is a member of a protected class. Further, defendants do not appear to contest that Lewis was qualified for his job. As to the final two elements, the parties harbor serious disagreement.

As to the third prong, the record supports that Lewis suffered two potentially adverse employment actions: the early cancelation of the original job posting, and the addition of a CDL requirement to a subsequent job posting. Though not the typical "materially adverse change in employment status," *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998), the effect of each of these employer decisions was to preclude Lewis from a potential promotion. The shop work afforded the opportunity to work away from the elements and to have the traditional weekend as his rest days.

Of course, employers are not required to afford opportunities for promotion. But, when employers do offer such opportunities, or offer such opportunities and then revoke them, the motivation behind the cancelation or addition of requirements could be subject to testing. *Accord Terry v. Gallegos*, 926 F.Supp. 679, 710 (W.D. Tenn. 1996) ("The EEOC may cancel vacancy announcements for a number of reasons, including budget considerations, staffing factors, and training opportunities. The motivation behind a vacancy cancelation determines whether the agency's action violates Title VII."). Thus, Plaintiff meets the third criteria because sufficient evidence suggests that he did apply for the first job posting and because the CDL requirement precluded his applying for the second posting.

Regarding the fourth prong, the evidence shows that Chris Hiser, a Caucasian car man, received the shop job advertised in Bulletin 2009-33. That Lewis did not apply for the September

shop job and did not possess the qualification of a CDL listed in Bulletin 2009-33 are not fatal to his prima facie case. If the CDL requirement was a sham requirement and the motivation for adding it was to ensure that Lewis did not get the job, then that could be enough.

B.

The burden now shifts to Roskovics and NSRC to establish legitimate, nondiscriminatory reasons for their actions. They contend that business circumstances changed shortly after Roskovics posted the six bulletins. NSRC Mechanical Department learned that two additional trains would be traveling through Louisville, increasing work for the yard. On or about June 3, 2009, Roskovics discussed with Kevin Krull, his supervisor, the influx of work in the receiving and forwarding portions of the yard. Krull authorized Roskovics to cancel all six bulletins he had posted on June 1, including the three that had eliminated yard positions. Roskovics posted Bulletin 2009-31 on June 4, 2009, indicating that, effective immediately, all six June 1 bulletins were "CANCELLED." Later, on June 5 and at Krull's direction, Roskovics composed written justification to bring one furloughed car man and one furloughed machinist back on duty.

This was at its heart a business decision upon which NSRC's various officials may have had different views. Few business decisions are made without some conflicting facts and opinions. Ample evidence supports Roskovics's and NSRC's explanation.

To explain Roskovics's decision to add a CDL requirement to the next posted shop job vacancy, Defendants claim that they knew Paul Jackson planned to retire from his work as a car man on second shift at NSRC "during[] if not prior to" December 2009 and wanted to ensure that NSRC would have sufficient car men working on that shift who could legally operate NSRC's crane truck on a public highway in the case of an emergency. Facially, such an explanation constitutes an absolutely legitimate business reason for adding the CDL requirement.

These explanations shift the burden back to Lewis to show pretext.

C.

The Sixth Circuit has identified three ways in which a plaintiff may rebut a defendant's legitimate, nondiscriminatory reason and demonstrate pretext. The plaintiff may show that:

> (1) the employer's stated reason for terminating the employee has no basis in fact, (2) the reason offered for terminating the employee was not the actual reason for the termination, or (3) the reason offered was insufficient to explain the employer's actions.

*Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 545 (6th Cir. 2008). The only basis for pretext here would be to somehow show that the reasons given for canceling the June job postings and inserting the CDL requirement later were not the actual reasons.

As to the June events, the showing of pretext hinges upon Lewis' assertion that Hiser approached Lewis directly after a telephone conversation with Roskovics and told Lewis "I just screwed you out of a job." Neither party has secured Hiser's deposition or an affidavit. Roskovics claims he never spoke with Hiser about the June job cancelations. That Chris Hiser, a less senior car man, could successfully cause NSRC to cancel Bulletin 2009-28 is a great inferential leap. Moreover, Krull, not Roskovics, appears to have made the ultimate decision. The Court finds insufficient evidence to suggest that the obvious business reason for the June 3 decision canceling the June postings were, in effect, fabricated.

As to the September events, Lewis argues that the CDL was not necessary. First, Jackson was not the sole car man working in the shop on second shift on Monday-Friday who held a CDL. Adam Laslie also held a CDL. Thus, a second inside man with a CDL was unnecessary. General Foreman Todd and SGF Roskovics himself testified that a different group could respond each time an emergency arose and that there was no set emergency response team. Regardless, it may be an unassailable legitimate business concern to have an adequate number of CDL holders

14

on each shift. Todd testified in his deposition "the more the merrier" when it came to having men who held a CDL.

In sum, the evidence strongly shows that the CDL requirement was a valid one, though not an absolutely necessary one in the circumstances. The matter seems to be one within Defendants' business judgment. This evidence is insufficient to permit the inference that the CDL requirement was a mere sham or pretext under Sixth Circuit precedent.

V.

Next the Court will analyze Lewis's race discrimination claim against NSRC and Shirrell Jones. This claim (Count II) is based on the decision to charge Lewis with conduct unbecoming an employee and his eventual termination resulting therefrom. The *McDonnell Douglas* burden shifting analysis detailed in Section IV.A applies to this claim as well.

To make out a prima facie case of discrimination, Lewis must set forth evidence that: "(1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (2008) (internal citations omitted).

The crux of Lewis's claim is that he was treated differently than a similarly situated Caucasian employee when he was charged with conduct unbecoming an employee, a charge that ultimately led to his termination. Defendants argue Lewis's prima facie case fails on the second prong because he was not meeting their expectations when he violated the unambiguous drug policy. Defendants argue Lewis also fails the fourth prong because Shibley is not similarly situated.

In October 2008, Timothy Shibley, a Caucasian equipment operator/locomotive attendant who still works at Youngstown Yard, pled guilty to manslaughter II and operating a motor vehicle under the influence of alcohol after killing his wife in a drunk driving accident in January, 2008. At the time of Shibley's plea and sentencing, Roskovics was the acting SGF and Steven Todd the acting GF. After being sentenced on December 1, 2008, Shibley reported to Youngstown Yard on prison work release on December 4 and informed his foremen[6] of his guilty plea, at least as to the manslaughter count.

Each foreman says that he did not know or ask whether alcohol was involved in the accident, and neither thought to ask Shibley why he had been charged with manslaughter and sentenced to jail time. In fact, no Norfolk Southern employee ever conducted an independent investigation into Shibley's criminal charges. However, NSRC maintains that Shibley's actions did not violate any Railroad rule or policy, so there would have been no basis to investigate or bring internal charges. No NSRC policy bans off-the-job alcohol usage and NRSC is adamant the term "drug" in its Off-the-Job Drug Activity policy does not encompass alcohol.

The Court finds that Lewis is unable to show that he and Shibley are "similarly situated" comparison employees. In cases alleging differential disciplinary action such as this one, Sixth Circuit case law requires the comparison employee to have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). Here,

---

[6] Todd already knew about the pending plea as of late November/early December 2008 because Shibley's sister had contacted him to secure NSRC's approval for Shibley to participate in a work release program. This period was the first time any of NSRC supervision knew about the Shibley incident. Shibley had already told Paul Jackson, his union representative and friend, about the incident. After charges were brought in March 2008, Shibley's license was revoked. Jackson provided transportation to Shibley from March 2008 through his retirement in December 2009.

a different supervisor decided how to handle the Shibley situation, a different collective bargaining agreement governed Shibley's employment,[7] and most importantly, there is the mitigating circumstance that off-the-job alcohol usage is not banned under company policy.

Lewis may be correct that killing one's wife in a car accident while under the influence of alcohol fits the generic definition of "conduct unbecoming an employee."[8] However, this rule may not even apply to Shibley, as a different collective bargaining agreement controls the terms and conditions of Shibley's employment—including under what circumstances Shibley can be disciplined.[9]

Even if the Court were to accept that Lewis has established a prima facie claim on the grounds that he and Shibley are appropriate comparators on an abstract level, Lewis is unable to rebut NSRC's explanation that Lewis was charged because his decision to plead guilty in June 2011 to possessing a schedule IV controlled substance without a prescription while off duty placed him in clear violation of NSRC's Off-the-Job drug activity policy. In other words, Lewis is unable to show

> (1) the employer's stated reason for [disciplining him] has no basis in fact, (2) the reason offered for [disciplining him] was not the actual reason for the termination, or [that] (3) the reason offered was insufficient to explain the employer's actions.

*Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 545 (6th Cir. 2008).

---

[7] In contrast to Lewis whose employment was governed by the collective bargaining between NSRC and the Brotherhood of Railway Carmen, Shibley's contract is governed by the collective bargaining agreement between NSRC and the Firemen and Oilers Union.

[8] *See* DN 51-8, Ex. H. The rule reads, "Employees are to conduct themselves in a professional manner and not engage in behavior or display material that would be considered offensive or inappropriate by co-workers, customers, or the public." The reference to "public" indicates that this policy is intended to reach actions that employees take while off-duty.

[9] Lewis's exhibit containing the "conduct unbecoming an employee" standard is an excerpted general rule of conduct. Its origin and the scope of its applicability is unclear from the record.

The ultimate question for the trier of fact is whether there was intentional discrimination involved in the decision-making. Lewis has not provided any evidence that this is so with regard to his internal charge and his eventual termination.

VI.

Lewis's § 1981 race discrimination claim is based on the same facts as the racial discrimination allegations analyzed above. As such, Lewis's § 1981 claim fails against each of the three Defendants.

Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendants' separate motions for summary judgment (DN 46, DN 47) are each SUSTAINED and Plaintiffs' claims are DISMISSED WITH PREJUDICE. All other motions are MOOT.

This is a final order.

cc:     Counsel of Record